UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| BARBARA T. BROWN | CIVIL ACTION NO. 05-1336 |
| VS. | JUDGE DOHERTY |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION | MAGISTRATE JUDGE METHVIN |

REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be **REVERSED** and that Brown be awarded benefits consistent with an onset date of September 30, 1999.

*Background*

Born on February 20, 1955, Barbara Brown ("Brown") is currently 52 years old. She has a high school education and has worked in the past as telephone answering service operator, personal care attendant, and jewelry sales clerk. On November 5, 2001, Brown applied for disability benefits and supplemental security income, alleging disability since September 30, 1999, due to lumbar degenerative disc disease with anterior spurring, cervical disc herniations, bilateral carpal tunnel syndrome, ventilatory defect, high blood pressure, pulmonary insufficiency, and depression.[1] Brown's application was denied initially and on reconsideration, and after an administrative hearing, the ALJ issued an unfavorable decision. Brown appealed the decision to the Appeals Council, which remanded the case to the ALJ for a new hearing.[2] A

---

[1] The application indicates that the disability began in 1999, and at the hearing, Brown testified that she became disabled in 1999. Tr. 45, 512.

[2] Tr. 381-383.

2

second hearing was held on October 4, 2004.[3]  In an opinion dated November 10, 2004, the ALJ denied benefits on grounds that Brown could perform her past work and was therefore not disabled.[4]  The Appeals Council denied review and Brown timely filed this appeal.

## *Assignment of Errors*

Brown alleges the following errors: 1) the decision is not supported by substantial evidence; 2) the ALJ erred in substituting his opinion for that of medical professionals; 3) the ALJ erred in failing to evaluate the combined effect of all of Brown's impairments;  4) a defective hypothetical was posed to the vocational expert;  5) the ALJ erred in determining Brown's residual functional capacity ("RFC"); 6) the ALJ erred in finding that Brown could perform substantial gainful employment; and 7) the ALJ erred in affording more weight to non-treating physicians.

## *Standard of Review*

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards.  Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991).  The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of

---

[3] Tr. 495-541.

[4] Tr. 14-23.

the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

### *ALJ's Findings*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

When a mental disability claim is made, such as depression here, the Commissioner utilizes a corollary sequential procedure for determining the merits of the claim. Essentially, this procedure substitutes specialized rules at Step 2 for determining whether a mental impairment is severe, and also provides detailed guidelines for making the Step 3 determination as to whether the mental impairment meets or exceeds the Listings. The Regulations require:

> [T]he ALJ to identify specifically the claimant's mental impairments, rate the degree of functional limitation resulting from each in four broad functional areas, and determine the severity of each impairment. Furthermore, § 404.1520a(e)

4

provides that the ALJ must document his application of this technique to the claimant's mental impairments.

Satterwhite v. Barnhart, 44 Fed.Appx. 652 (5th Cir. 2002) (unpublished).[5]

In the instant case, the ALJ determined that Brown's lumbar degenerative disc disease, bilateral carpal tunnel syndrome, osteoarthritis of the left foot, and hypertension are severe within the meaning of the regulations. The ALJ concluded that Brown retains the residual functional capacity to perform occasional lifting of up to 20 pounds, frequent lifting of 10 pounds, standing or walking for up to six hours in an eight-hour workday, sitting for up to six hours in a workday, no work requiring the use of vibrating tools, and no work requiring extreme range of motion of the wrists.[6] Relying on the testimony of a vocational expert, the ALJ concluded that Brown can return to her past work, and therefore, she is not disabled.

---

[5] For a succinct summary of the current law, see Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004):
  1. The ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he or she has a medically determinable mental impairment.
  2. If a medically determinable mental impairment is found, the ALJ must then rate the degree of functional limitation resulting from the impairment in four areas: (1) activities of daily living; (2) social functioning; (3) persistence or pace of concentration; and (4) episodes of decompensation. See C.F.R. §404.1520a(c)(3).
  3. When a severe mental impairment is found, the Commissioner determines whether the impairment meets or exceeds the requirements of the Listings.
  4. When the severe mental impairment does not meet Listing requirements, the Commissioner then assesses the claimant's residual functional capacity.

The procedure states that if the degree of limitation in the first three functional areas is "none" or "mild," and "none" in the fourth area, the ALJ will generally conclude that the impairment is not severe, *unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities.* Serrano-Diaz v. Barnhart, 2004 WL 2431693, *6 (E.D.Pa. 2004), citing 20 C.F.R. §404.1520a(d)(1).

[6] Tr. 22.

5

*Findings and Conclusions*

**I.   Medical History**

*Carpal Tunnel Syndrome*: In 1997, Brown was treated by Dr. Louis Blanda, an orthopedist, for left wrist pain. An EMG and nerve conduction study of Brown's left upper extremity showed median nerve entrapment neuropathy at a level of the carpal tunnel.[7] On July 9, 1998, Dr. Blanda noted that Brown continued to experience pain in her left arm and hand and he recommended that she undergo carpal tunnel release.[8]

In October, 1999, Brown was examined by Dr. John Tassin.[9] Brown advised that her right thumb had been smashed in a car door. Dr. Tassin prescribed Darvocet for pain relief.[10] Brown continued treatment with Dr. Tassin from 1999-2001, during which he continued her on Darvocet, as well as Celebrex for arthritis.[11]

On November 27, 2000, Brown was examined by Dr. Andrew Kucharchuk, an orthopedist, complaining of pain in her right wrist and hand.[12] Examination of the right wrist showed swelling in the area of the carpal tunnel, with diminished grip strength. Brown had positive Phalen and Tinel signs on the right, indicating carpal tunnel syndrome. On December 12, 2000, an EMG nerve conduction study was completed, which showed bilateral

---

[7] Tr. 309.

[8] Tr. 305.

[9] Tr. 296.

[10] Darvocet is a narcotic pain reliever. http://www.drugs.com/darvocet.html

[11] Tr. 292-297.

[12] Tr. 346-351.

6

carpal tunnel syndrome, right greater than left.[13] On January 25, 2001, Dr. Kucharchuk noted that the EMG results showed that Brown had a severe carpal tunnel on her right hand. Dr. Kucharchuk opined that Brown may need a decompression of her radiocarpal tunnel and reconstruction of the ulnar collateral ligament.[14] Brown did not undergo surgery, but she did continue treatment with Dr. Kucharchuk, which included steroid injections.[15] Brown was prescribed Vioxx for pain relief.[16]

In 2002, Dr. Ronald Sylvest, an orthopedist, examined Brown and found that she had carpal tunnel syndrome and degenerative arthritis of the carpometarcarpal joint of the right thumb. Dr. Sylvest recommended carpal tunnel release, as well as steroid injections.

In June, 2002, Brown returned to Dr. Kucharchuk, with a chief complaint of pain in her right thumb.[17] On June 16, 2003, Brown was examined by Dr. F. Allen Johnston, an orthopedist.[18] Brown complained of constant aching, throbbing, swelling, and pain in her right thumb. Activities using her right hand aggravated the condition. The examination revealed crepitance with stiffness and pain at the right carpometacarpal ("CMC") joint. Dr. Johnston diagnosed post-traumatic degenerative joint disease at the right CMC joint. Dr. Johnston noted that if conservative treatment was not successful, he would recommend fusion of the CMC joint

---

[13] Tr. 342.

[14] Tr. 344.

[15] Tr. 328.

[16] Vioxx is used to reduce pain, inflammation, and stiffness caused by osteoarthritis. http://www.drugs.com/vioxx.html

[17] Tr. 327.

[18] Tr. 426.

of her right thumb. On July 10, 2003, Dr. Johnston prescribed Bextra for pain and inflammation relief.[19] In May, 2004, Dr Johnston noted that Brown continued to have pain in her right thumb CMC joint and that she had tenderness, crepitus, and weakness in this area.[20] Dr. Johnston noted that surgical fusion may be necessary at some point.

*Back pain*: From November, 1995 to August, 2003, Brown was treated for a variety of ailments, including back pain, at Southwest Louisiana Primary Health Care ("SLPHC"). X-rays of Brown's lumbar spine taken in March, 1996 showed mild degenerative changes in her thoracic spine and lower lumbar spine.[21] In June, 2003, Brown described her back pain as intermittent.[22] On January 9, 2004, Brown was examined at University Medical Center ("UMC") complaining of lumbosacral strain. Brown was prescribed Toradol for pain relief.[23]

*Cervical spine*: In September, 1997, an MRI of Brown's cervical spine revealed C4-5, C5-6, and C6-7 right lateral focal disc herniations causing nerve and cord compression.[24] Brown did not have neurological deficits, and therefore, Dr. Blanda recommended conservative treatment.

---

[19] Tr. 427. Bextra is used to relieve pain and inflammation.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602011.html#why

[20] Tr. 431.

[21] Tr. 273. It is noted that Brown states in her brief that Dr. Blanda interpreted an MRI as showing disc herniation at L4-5. Rec. Doc. 19 at p. 5. A review of the record shows that the MRI referenced is one of the cervical spine, not the lumbar spine. Tr. 308. Thus, the disc herniation at level 4-5 discussed in the MRI is the C4-5 area.

[22] Tr. 224.

[23] Tr. 453.

[24] Tr. 308.

*Arthritis, ankle and heel*:  On August 28, 1998, Brown was diagnosed with arthritis in her shoulders.[25]  She was prescribed Daypro for arthritis relief.[26]  On January 24, 2003, Brown was treated at SLPHC for pain in both ankles.[27]  In April, 2003, Brown complained of right ankle pain and was prescribed Celebrex.[28]  On June 18, 2003, Brown continued to experience ankle pain and her medication was switched from Celebrex to Daypro.[29]

On September 2, 2004, Brown was examined at UMC, complaining of right heel and ankle pain.[30]  An x-ray of the right foot showed "multiple well corticated calcific fragments at the base of the 5th metatarsal are most likely chronic" and "calcaneal spurring." An x-ray of the right ankle showed swelling, but otherwise was normal.[31]

*Hypertension*: In August, 1998, Brown was seen at SLPHC complaining of chest and left arm pain that increased with exertion.[32]  Brown was prescribed Norvasc for high blood pressure.[33]  On May 5, 1999, Brown was examined at UMC complaining of chest pain and shortness of breath with exertion.[34]  An x-ray of Brown's chest was normal.  Brown was

---

[25] Tr. 232.

[26] Daypro is used to reduce pain, swelling, and joint stiffness from arthritis. http://www.webmd.com/drugs/drug-6746-Daypro+Oral.aspx?drugid=6746&drugname=Daypro+Oral

[27] Tr. 227.

[28] Tr. 225.  Celebrex is used to relieve arthritis pain

[29] Tr. 224.

[30] Tr. 436.

[31] Tr. 438.

[32] Tr. 231.

[33] Norvasc is used to treat high blood pressure. http://www.norvasc.com/high-blood-pressure-medicine/index.asp

[34] Tr. 184.

prescribed Clonidine to treat her high blood pressure.[35]  Brown also takes Magzide, a diuretic, to remove excess fluid.[36]

    *Abdominal and GI*: In July, 1999, Brown underwent an abdominal X-ray because of a history of left-sided epigastric and atypical chest pain.[37]  The test showed esophageal dismotility, gastroesophageal reflux, and a small sliding hiatal hernia.  Brown was prescribed Prilosec.  In January, 2000, Brown underwent an upper GI series, which revealed a gallstone.[38]  In February, 2004, Brown continued to experience abdominal pain and an ultrasound showed "bulbous configuration of the uterine fundus with pelvic ultrasound, otherwise, within normal limits."[39]

    *Obesity*: Brown is 5 feet 7 inches tall and her weight has fluctuated between 220 and 240.[40]  Brown has been described as "obese."[41]

    *DDS Examination and Physical Assessment*: At the request of DDS, Brown was examined by Louis H. Nix, an internist on May 24, 2002.[42]  Brown's primary complaints were of high blood pressure and joint pain.  Brown had difficulty walking on her heels and toes due to heel and knee pain.  Dr. Nix noted that there was questionable effort on the heel-to-toe exam.

---

[35] Tr. 180.  Clonidine is used to treat high blood pressure.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682243.html

[36] Tr. 102.

[37] Tr. 182.

[38] Tr. 160-162.

[39] Tr. 446.

[40] Tr. 107, 128, 129, 133, 197, 224.

[41] Tr. 228, 235.

[42] Tr. 196-200.

10

Brown had a full range of motion and only slight swelling in her right knee. Brown had a decreased range of motion of her lumbar spine, with poor effort noted. Dr. Nix noted that there was a question of malingering.

A non-examining medical consultant completed a Physical Functional Capacity Assessment on June 7, 2002.[43] Brown was found to be capable of performing light work.

*Depression*: On June 17, 1996, Brown reported to her physician at SLPHC that she felt helpless. Brown was diagnosed with depression and prescribed Zoloft.[44] On June 12, 2002, the Social Security Administration ("SSA") had R.H. Rolston, Ph.D., a non-examining medical consultant, conduct a Psychiatric Review Technique ("PRT").[45] The consultant concluded that Brown did not have a medically determinable mental impairment.

## II.  Administrative Hearing

At the administrative hearing held on October 4, 2004, Brown testified that she was working part-time at a jewelry store. She began working part-time in 1999 when she had to reduce her work time due to her impairments.[46] She feels that she became disabled in 1999 because she "just couldn't take it anymore because of the swelling."[47] Her employer allows her to sit and elevate her feet due to swelling.[48] Her employer makes special concessions for her because she has been working for them for over 12 years. She cannot perform the job duties like

---

[43] Tr. 201-208.

[44] Tr. 266.

[45] Tr. 209-221.

[46] Tr. 501.

[47] Tr. 512.

[48] Tr. 502.

the other clerks because of her carpal tunnel. When she cleans jewelry, she can achieve the same end product as the other clerks, but she has to take several additional steps because she cannot rub the jewelry the way the other clerks can.[49] After she works for a few hours, she has to recuperate.[50] She has never had carpal tunnel surgery. She experiences pain and stiffness in her joints every day and activity increases the stiffness. Rest relieves her pain. Brown testified that she cannot stand for more than 15 to 20 minutes at a time, and if she exceeds that, she has to elevate her feet afterward. She does not think she can walk a city block or sustain activity for more than 30 minutes or so.[51] Brown testified that she does her own laundry and grocery shopping.[52] She likes to read and watch television.[53] She does not work in the yard. She used to sew, but cannot do that anymore because of the problems with her hands.

## III.　Analysis

### *Errors 1-7: Non-disability finding*

Brown contends that the ALJ's decision is not supported by substantial evidence. Brown alleges that the ALJ did not afford appropriate weight to the opinions of the treating physician, that he failed to consider the combined effect of her impairments, and he erred in concluding that she could perform sustained gainful employment.

The ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their opinions accordingly. Greenspan v. Shalala, 38 F.3d 232, 237 (5th

---

[49] Tr. 510.

[50] Tr. 517.

[51] Tr. 521.

[52] Tr. 506.

[53] Tr/ 507.

12

Cir. 1994). Although the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, "the ALJ has sole responsibility for determining a claimant's disability status." Martinez v. Chater, 64 F.3d 172, 175-176 (5th Cir. 1995), quoting, Moore v. Sullivan, 919 F.2d 901, 905 (5th cir. 1990). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Id. quoting, Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir. 1987). The ALJ is certainly able to decrease reliance on treating physician testimony for good cause. Leggett v. Chater, 67 F.3d 558, 566 (5th Cir. 1995). "Good cause for abandoning the treating physician rule includes 'disregarding statements [by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.'" Id.

The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). The ultimate issue of disability is reserved to the Commissioner. The opinion of a treating physician on this issue is not entitled to controlling weight, although it should be given appropriate weight depending on whether it is supported by the medical record. 20 C.F.R. Sec. 416.927 (e) (1988).

In cases where uncontroverted medical evidence reveals a basis for subjective complaints of pain, an "ALJ's unfavorable credibility evaluation of a claimant's complaints of pain will not be upheld on judicial review" unless the ALJ provides an articulated basis for discrediting the claimant's credibility. Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985); Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987).

13

Here, the ALJ addressed the medical evidence and concluded:

> Accordingly, the undersigned finds the claimant retains the following residual functional capacity: the ability to perform occasional lifting and/or carrying of up to twenty pounds, frequent lifting and/or carrying of up to ten pounds, standing and/or walking for up to six hours in an eight-hour workday, sitting for up to six hours in an eight-hour workday, no work requiring the use of vibrating tools, and no work requiring extreme range of motion of the wrists.[54]

Using this residual functional capacity and relying on the testimony of a vocational expert, the ALJ found that Brown could perform her past work as a telephone answering service operator, personal care attendant, and jewelry sales clerk.

The record does not contain any information from examining physicians concerning the specific work-related tasks that Brown can or cannot do. Thus, the ALJ's decision is based on the report of a non-examining medical consultant, and the ALJ's assessment of Brown's credibility. In determining Brown's residual functional capacity, the ALJ discounted Brown's credibility:

> \*\*\* Despite her complaints of severe pain, the Administrative Law Judge notes the claimant takes only anti-inflammatory medication for pain relief. She is taking no narcotic pain medication, which makes it difficult to assume that her pain is at the level of severity that she alleges.
>
> Despite the claimant's allegations of severe pain, her description of daily activities was not limited to the extent one would expect given the complaints of disabling symptoms and limitations. She is able to perform household chores, manage her financial affairs, work on a part-time basis, and requires no assistance with personal hygiene tasks.
>
> Additionally the claimant has been diagnosed with obesity. According to SSR 02-1p obesity can cause limitation of function and its effects must be considered when evaluating disability. Medical evidence in 1999 from Southwest Louisiana Primary Health Care listed the claimant's weights as 224 pounds. The claimant

---

[54] Tr. 22.

14

testified at the hearing that she weighed 220 pounds and was 5'7" tall. The claimant's alleged decreased appetites seems to be belied by her obesity problems.

Accordingly, the undersigned has considered the combination of impairments, particularly her right upper extremity complaints, back complaints, and hypertension (combined with obesity), in determining her residual functional capacity.

The Administrative Law Judge notes the claimant has a pending lawsuit with regard to her 1999 right hand injury. Inherent in any litigation is an element of secondary gain which may result in exaggeration as to the severity and duration of one's condition in order to enhance any monetary judgment or settlement.

Although the claimant has a multitude of complaints and references to diagnoses, there are few objective medical findings to substantiate her allegations, especially with respect to the alleged medication side effects.[55]

Thus, the ALJ discounted Brown's allegations that she cannot work on a sustained basis due to her pain and the limitations imposed by her impairments. The record, however, does not support the ALJ's decision to discount Brown's credibility. The ALJ's conclusion that Brown's pain is not severe because she was not prescribed narcotic pain medication is factually deficient. A review of the record shows that Brown has been prescribed Celebrex, Mobic, Bextra, Daypro, and Darvocet for pain. The latter medication was prescribed for over two years.[56] Moreover, Brown received repeated steroid injections, indicating that Brown's condition was severe and not controlled by simple oral anti-inflammatory medication. Likewise, Brown was prescribed Norvasc and Magzide to control her high blood pressure. Brown advised the SSA in writing that these medications make her tired, nauseous, and cause her abdominal pain.[57]

---

[55] Tr. 21-22.

[56] Tr. 292-297.

[57] Tr. 102.

15

Likewise, the ALJ's reference to Brown's pending litigation does not undermine Brown's allegations. Brown's litigation related solely to her right hand problems, however, the disability application encompasses her entire medical condition.

Moreover, the ALJ erroneously concluded that "there are few objective medical findings to substantiate her allegations."[58] A review of the record shows that the medical evidence supports Brown's allegations of pain and limitations. Two EMG nerve conduction studies show bilateral carpal tunnel syndrome, and three physicians have recommended that she undergo surgery.[59] X-rays of Brown's spine show degenerative changes in her thoracic spine and lower lumbar spine.[60] Brown has cervical spine disc herniations causing nerve and cord compression.[61] She has been diagnosed with arthritis in her shoulders and both ankles. Further, an x-ray of the right foot showed "multiple well corticated calcific fragments at the base of the 5th metatarsal are most likely chronic" and "calcaneal spurring." Brown suffers from hypertension and has a long history of episodes of severe chest pain and has been prescribed medication to control her blood pressure. Additionally, testing has revealed that Brown has esophageal dismotility, gastroesophageal reflux, and a small sliding hiatal hernia, as well as a gallstone.[62] Finally, Brown is "obese."[63] These medical problems are all supported by objective medical tests.

---

[58] Tr. 22.

[59] Tr. 342.

[60] Tr. 273.

[61] Tr. 308.

[62] Tr. 160-162.

[63] Tr. 228, 235.

16

Furthermore, the ALJ's determination that the fact that Brown works part-time and can perform household chores means she was not being truthful in her testimony concerning her inability to perform sustained activity is incongruous. This is not the case of a claimant maintaining that she is totally and completely incapacitated. The record shows Brown has attempted to continue to work, but is unable to work full-time due to her multitude of impairments. Moreover, even in the few hours a week Brown is able to work, she has to take repeated rest breaks, performs the work in a more tedious manner due to her hand impairments, and has to recuperate on her days off.

Likewise, the fact that Brown can also perform some household chores does not support a finding that she can perform those chores for a substantial amount of time. The fact that Brown has attempted to continue to be active but can only do so on a limited basis lends Brown credibility.

Finally, although the ALJ mentioned that he considered Brown's obesity, he did not articulate how Brown's obesity affects her ability to perform work related tasks.[64] The ALJ

---

[64] Obesity remains a factor to be considered in determining whether an individual is disabled. Social Security Ruling (SSR) 02-01p states in pertinent part:

    **Step 3, The Listings**
    **7. How do we evaluate obesity at step 3 of sequential evaluation, the listings?**
    Obesity may be a factor in both "meets" and "equals" determinations.
    Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.
    * * *
    An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.
    * * *
    As with any other impairment, we will explain how we reached our conclusions on whether obesity

failed to address the effect of Brown's obesity on her ability to perform routine movement and necessary physical activity within the work environment. The record shows that Brown is 5' 7" tall and weighs between 220 and 240 pounds. She has arthritis, swelling of the ankles, and a heel spur that can legitimately be adversely affected by the additional weight carried by Brown. Yet, the ALJ did not address these facts.

The overwhelming evidence of record shows that Brown's condition is of a chronic and severe nature, which prohibited her from maintaining full-time employment. In order to be capable of engaging in substantial gainful activity, a person must have a realistic chance of both obtaining as well as holding a job in a *realistic* work setting:

> In [Wingo v. Bowen, 852 F.2d 827 (5th Cir.1988)], this Court held that a determination that a person is capable of engaging in substantial gainful activity depends on a finding not only that the individual has some chance of being hired, but also, that, taking account of the individual's exertional and non-exertional limitations, the individual has a reasonable chance, "once hired, of keeping the job." *Id.* at 831. We noted that "[a] claimant capable of performing sedentary or light work under the guidelines must have the ability to perform the required physical acts day in and day out in the sometimes competitive and stressful conditions in which all people work in the real world." *Id.* (*citing* Allred v. Heckler, 729 F.2d 529, 533 (8th Cir.1984)).

Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002).

Considering that Brown cannot perform work without the need for days of recuperation and serious job modifications, and the fact that the vocational expert testified that employers would not tolerate an employee's absences from work, the undersigned finds that the ALJ's determination that Brown could perform her past work on a sustained basis is not supported by substantial evidence.

---

caused any physical or mental limitations.

*Conclusion*

Considering the foregoing, it is recommended that the decision of the ALJ be **REVERSED** and that judgment be rendered in favor of Brown for benefits with an onset date of September 30, 1999.

Any judgment entered herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  See, Richard v. Sullivan, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on September 4, 2007.

Mildred E. Methvin
United States Magistrate Judge